IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CITY OF SPOKANE VALLEY, a Washington non-charter city, | ) ) ) | No. 33140-7-III |
| Respondent, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| BRIAN DIRKS and CHRISTINE DIRKS, husband and wife; and MARESSA DIRKS and JOHN DOE DIRKS, wife and husband; and CA-WA CORP, a California corporation, d/b/a HOLLYWOOD EROTIQUE BOUTIQUE, a/k/a HOLLYWOOD EROTIC BOUTIQUE, | ) ) ) ) ) ) ) ) ) | |
| Appellants. | ) | |

LAWRENCE-BERREY, J. — This case requires us to examine the applicability of certain licensing and zoning code provisions to Hollywood Erotic Boutique's adult video viewing rooms, and the constitutionality of those provisions. We hold that the licensing and zoning code provisions apply to Hollywood Erotic Boutique's viewing rooms, and that the challenged provisions are constitutional. We, therefore, affirm the trial court's summary judgment order and order of abatement.

FACTS

CA-WA Corp. operates Hollywood Erotic Boutique (HEB), a retail business at 9611 East Sprague Avenue in the City of Spokane Valley. CA-WA leases the premises from members of the Dirks family, who own the property. HEB was formerly operated by World Wide Video of Washington, Inc. CA-WA purchased HEB in 2006.

HEB's retail portion of the store sells sexually explicit DVD's and magazines, as well as adult novelties and lingerie. Since 2002, HEB has also operated six enclosed viewing rooms on the premises where patrons can watch sexually explicit movies for an entrance fee. Five of the viewing rooms are on the second level of the building situated along a continuous corridor. Each viewing room is separated from the corridor by a closed door, is roughly 10 feet by 10 feet, contains multiple plastic chairs for seating people, and a large screen television for viewing movies in the darkened room. Movies play continually. Patrons pay $12 to enter the viewing room area, may remain in the viewing room area for four hours, and are permitted to move from room to room. Patrons cannot control the movies being shown. The screen in each room is connected by a cable to a DVD player. The DVD players for each room are located behind the clerk's counter downstairs and are controlled by a store employee.

In the spring of 2007, a citizen complaint led the City of Spokane Valley to believe that CA-WA was operating an adult entertainment establishment at HEB. The City investigated in May 2007. Code enforcement officer Chris Berg and members of

2

other city agencies met with the manager of HEB at the business. The manager granted city officials permission to inspect the business. Detective James Wakefield inspected the second floor area. In addition to observing the closed viewing rooms as described above, he also observed persons in the rooms masturbating.

After the inspection, all agency personnel who were present agreed that an adult entertainment arcade was being operated on the second floor of HEB. We will later provide Spokane Valley's definition of "adult entertainment arcade." Mr. Berg informed the manager that HEB was licensed for retail sales, and to continue to operate the viewing rooms, HEB needed to obtain an adult entertainment establishment license through the City. The manager agreed to shut down the viewing rooms until a license could be obtained. HEB did not obtain an adult entertainment establishment license and eventually reopened the viewing rooms.

More site visits occurred over the next several years. Detective Wakefield continued to report on the activities at HEB. His reports show that viewing rooms generally contained one, two, or three men engaging in masturbation, although one report reflects five men and one woman, with all but two men engaged in masturbation. The City also documented Internet postings for sexual encounters at HEB.

Over the course of the multi-year investigation, the City exchanged correspondence with CA-WA. Director of Operations Darryl Richardson denied that HEB's activities required it to be licensed as an "adult entertainment establishment" as

3

defined by the Spokane Valley Municipal Code (SVMC). In May 2012, the City filed a complaint against CA-WA and the Dirks for declaration of a public nuisance, code violations, and a warrant of abatement. The complaint was aimed only at the viewing rooms, not at HEB's first floor adult retail business.

Historical County and City Adult Entertainment Regulations. HEB began its adult retail business in 1999 and the viewing rooms in 2002, prior to the City incorporating in March 2003. We, therefore, examine the pertinent adult entertainment regulations in effect prior to the City's incorporation.

In 1999, 9611 East Sprague was within unincorporated Spokane County and subject to the Spokane County Code (SCC). Spokane County prohibited operation of an adult entertainment establishment without a valid license.

The County also regulated zoning of adult entertainment establishments. Adult bookstores and adult entertainment establishments were allowed in the B-3 zone under chapter 14.628 SCC, but not if within 1,000 feet of property zoned UR-22, UR-7, and/or U/R 3.5. 9611 East Sprague was rezoned to B-3 on January 11, 1999. The parcel was within 1,000 feet of property zoned UR-22. Nevertheless, HEB established its retail sales operation on this parcel later in 1999.

The County amended its zoning code in September 1999. The 1999 amendment separated adult retail establishments from adult bookstores. The resolution also made the definition of "adult entertainment establishment" the same as the definition found in

4

chapter 7.80 SCC in the County licensing code. Section 7.80.040 contains the following definitions:

"Adult arcade device," sometimes also known as a "panoram," "preview," "picture arcade," "adult arcade," or "peep show," means any device which, for payment of a fee, membership fee, or other charge, is used to exhibit or display a graphic picture, view, film, videotape, or digital display of specified sexual activity, or live adult entertainment *in a booth setting.* All such devices are denominated under this chapter by the term "adult arcade device." The term "adult arcade device" as used in this chapter does not include other games which employ pictures, views, or video displays, or gambling devices which do not exhibit or display adult entertainment.

"Adult arcade establishment" means a commercial premises to which a member of the public is invited or admitted and where adult arcade stations, booths, or devices are used to exhibit or display a graphic picture, view, film, videotape, or digital display of specified sexual activity, or live adult entertainment *in a booth setting* to a member of the public on a regular basis or as a substantial part of the premises activity.

"Adult arcade station" or "booth" means an enclosure where a patron, member, or customer would ordinarily be positioned while using an adult arcade device or viewing a live adult entertainment performance, exhibition, or dance *in a booth.* Adult arcade station or booth refers to the area in which an adult arcade device is located and from which the graphic picture, view, film, videotape, digital display of specified sexual activity, or live adult entertainment is to be viewed. These terms do not mean such an enclosure that is a private office used by an owner, manager, or person employed on the premises for attending to the tasks of his or her employment, if the enclosure is not held out to any member of the public for use, for hire, or for a fee for the purpose of viewing the entertainment provided by the arcade device or live adult entertainment, and not open to any person other than employees.

"Adult entertainment establishment" collectively refers to adult arcade establishments and live adult entertainment establishments, as defined herein.

5

CP at 241 (italics added to "booth" or "booth setting" for future references). These definitions were in place in 2002, when HEB began operating its viewing rooms.

Upon incorporation in March 2003, the City adopted the County zoning regulations as the City's interim regulations. In 2007, the City adopted chapter 19.80 SVMC to replace the provisions of the adult entertainment zoning ordinance. According to SVMC 19.80.010, the City's intent in adopting chapter 19.80 SVMC was to "protect the general public health, safety and welfare of the citizenry of the City of Spokane Valley through the regulation of operations and licensing of the adult entertainment devices, premises and personnel of adult entertainment establishments." SVMC 19.80.020 stated that the licensing requirements of adult uses were contained in chapter 5.10 SVMC. SVMC 19.80.030(B) prohibits adult uses within 1,000 feet of public libraries, public playgrounds and parks, public or private schools kindergarten to twelfth grade, nursery schools, mini-day care centers, day care centers, places of religious worship, and any other adult use. In addition, SVMC 19.80.030(C) prohibits adult uses within 1,000 feet of areas zoned Single-Family Residential Estate districts (R-1), Single-Family Residential Suburban districts (R-2), Single-Family Residential districts (R-3), Single-Family Residential Urban districts (R-4), Multifamily Medium Density Residential districts (MF-1), Multifamily High Density Residential districts (MF-2), Mixed Use Center districts (MUC), Corridor Mixed Use districts (CMU), City Center districts (CC), or Neighborhood Commercial districts (NC). Because 9611 East Sprague

6

was zoned CMU, adult entertainment establishments were not allowed where HEB was located, unless HEB qualified as a lawful nonconforming use.

In 2010, the City changed its adult entertainment licensing code, repealing the prior version of chapter 5.10 SVMC and replacing it with new regulations. The City found the new regulations were necessary to protect the public. The City based this determination on studies and police reports demonstrating the adverse impacts generated by adult entertainment businesses, including public sexual conduct, possible spread of sexually transmitted disease, prostitution, and other criminal conduct.

Just as in prior versions, the 2010 version of SVMC 5.10.020 required a license for operation of an adult entertainment establishment. Additionally, the new ordinance stated that an adult entertainment license would not be issued for operation of an adult entertainment establishment in a location that does not meet the zoning requirements set forth in chapter 19.80 unless otherwise exempt. SVMC 5.10.040(A)(9).

The new licensing ordinance contained definitions that were similar to the prior definitions in the code, except that references to "booth" and "booth setting" were eliminated. The 2010 definitions still listed an adult arcade establishment as a type of adult entertainment establishment. SVMC 5.10.010. For "adult arcade establishment," "adult arcade device," and "adult arcade station" the 2010 SVMC definitions state:

7

"Adult arcade device," sometimes also known as a "panoram," "preview," "picture arcade," "adult arcade," or "peep show," means any device which, for payment of a fee, membership fee or other charge, is used to exhibit or display a graphic picture, view, film, videotape, or digital display of specified sexual activities or sexual conduct. All such devices are denominated under this chapter by the term "adult arcade device." The term "adult arcade device" as used in this chapter does not include other games which employ pictures, views, or video displays, or gambling devices which do not exhibit or display adult entertainment.

"Adult arcade establishment" means a commercial premises, or portion of any premises, to which a member of the public is invited or admitted *and where adult arcade stations or adult arcade devices* are used to exhibit or display a graphic picture, view, film, videotape, or digital display of a [sic] *specified sexual activities or sexual conduct* to a member of the public *on a regular basis or as a substantial part of the premises activity.*

"Adult arcade station" means any enclosure where a patron, member, or customer would ordinarily be positioned while using an adult arcade device. Adult arcade station refers to the area in which an adult arcade device is located and from which the graphic picture, view, film, videotape, digital display of specified sexual activities or sexual conduct is to be viewed. These terms do not mean such an enclosure that is a private office used by an owner, manager, or person employed on the premises for attending to the tasks of his or her employment, if the enclosure is not held out to any member of the public for use, for hire, or for a fee for the purpose of viewing the entertainment provided by the arcade device, and not open to any persons other than employees.

SVMC 5.10.010 (italics added for ease of future reference in analysis of these provisions). SVMC Appendix A includes substantially similar definitions. Appendix A directs that undefined terms be construed as defined in *Webster's New Collegiate*

*Dictionary.*[1] HEB has never possessed a license to operate an adult entertainment establishment, whether before or after the City incorporated in March 2003.

Proceedings in Trial Court. In 2012, the City filed a motion for summary judgment for declaration of public nuisance, code violations, and warrant of abatement. CA-WA responded to the City's motion and also filed its own cross motion for partial summary judgment. CA-WA asked the court to find that HEB was a lawful nonconforming use under the SVMC. Also, CA-WA argued, and the City agreed, that an order of abatement would be premature until the constitutionality of the ordinances could be analyzed.

On April 5, 2013, the trial court entered an order declaring HEB's viewing room activities a public nuisance in violation of SVMC 5.10.020(A) and SVMC 19.80.030(C). The court denied CA-WA's cross motion for partial summary judgment.

In a written opinion, the court noted that HEB was in operation prior to City incorporation, so chapter 7.80 SCC applied to HEB. The court determined that the viewing rooms qualified as an adult entertainment establishment under the definitions in SCC 7.80.040 because (1) HEB used a DVD player to display a graphic picture screen to

---

[1] The County code did not contain a similar directive. We note that there is no such dictionary as "Webster's New Collegiate Dictionary," but there are numerous editions of *Merriam-Webster's Collegiate Dictionary*. We will use the 11th edition, published in 2003, since that was the newest edition at the time of the 2010 ordinance amendments.

six separate theaters of specified sexual activity for the cost of a fee by the invited public, (2) DVD players are devices as contemplated by the code that were used to exhibit or display, on a commercial premises, where the public was admitted for a fee and could watch, and (3) HEB ran these viewing rooms during its business hours, equating to a regular or substantial basis. The trial court also determined that because HEB was not licensed under the County licensing requirements, nor could it be because it was within 1,000 feet of a disqualifying zone, HEB was not a lawful nonconforming use. The trial court further determined that because HEB could not obtain an adult entertainment license at its present physical location, it did not have standing to challenge the licensing requirements of chapter 5.10 SVMC.

The remaining issue for the trial court was whether chapter 19.80 SVMC denied CA-WA a reasonable opportunity to open and operate an adult entertainment business. After a period of discovery, the City filed a motion for summary judgment on the constitutionality of the zoning code. One part of the issue was whether alternative avenues of communication remained available under the challenged zoning regulation. The City supported its summary judgment motion with a list of parcels lawfully zoned for adult entertainment uses. The City's expert, Bruce Jolicoeur, determined that there were 54 available relocation parcels, none of which were in an industrial or manufacturing zone and all of which were commercially zoned. Mr. Jolicoeur then excluded 9 of these parcels as lacking road frontage, leaving 45 relocation sites.

The City also presented a declaration from land use planning consultant Reid Shockey. Mr. Shockey concluded, among other things, that 5.0 percent of Spokane Valley's acreage was available for adult entertainment establishments.

City planning manager Scott Kuhta stated in his declaration that there were four adult businesses in the geographic area incorporated into Spokane Valley. All of these businesses were lawful at the time of incorporation and had valid nonconforming use rights. A fifth adult retail business closed sometime between 2003 and 2004. Mr. Kuhta stated that the number of adult businesses has remained steady considering that no new applications have been filed.

In response, CA-WA presented a declaration and report from land use planners Lee Michaelis and Robert Thorpe. The report identified 39 properties within Spokane Valley that could be used as adult businesses. The majority of these properties were occupied by existing businesses. Five of the properties were occupied by the railroad and one by the Spokane Transit Authority. Others were occupied with large retailers, restaurants, or hotels. The report identified 1.2 percent of the City land available for adult entertainment establishments.

Real Estate broker Rich Crisler also provided a declaration for CA-WA. Mr. Crisler offered his opinion as to whether the owners of the various sites were likely to make their land available to adult businesses. Mr. Crisler asserted that four of the properties were vacant land and the majority of the remainder were occupied by existing

11

businesses. Additionally, Mr. Crisler contended that 15 of the parcels identified by Mr. Jolicoeur were occupied by well-established businesses and were unlikely to become available within the reasonably foreseeable future.

On December 20, 2013, the trial court granted the City's motion and issued a warrant of abatement. The court determined that no genuine issue of material fact existed as to the adequacy of the alternative avenues of communication for CA-WA to open and operate an adult entertainment establishment within the City. The court also determined that the City was entitled to summary judgment as a matter of law on CA-WA's counterclaims, including the constitutionality of chapter 5.10 SVMC and/or chapter 19.80 SVMC. The trial court concluded that the City was entitled to a warrant of abatement pursuant to chapter 7.48 RCW for CA-WA's unlawful adult entertainment establishment at HEB, as defined by chapter 5.10 SVMC.[2]

CA-WA appeals. CA-WA contends that (1) HEB's viewing rooms are a lawful nonconforming use, (2) HEB's viewing rooms are not subject to the licensing requirements of chapter 5.10 SVMC because the viewing rooms do not fall within the definition of "adult entertainment establishment," (3) HEB has standing to challenge chapter 5.10 SVMC, and (4) SVMC's adult entertainment licensing and zoning regulations are unconstitutional.

---

[2] The court's order exempted HEB's adult retail activities.

ANALYSIS

On appeal, orders of summary judgment are reviewed de novo. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 483, 78 P.3d 1274 (2003) (quoting *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002)). This court reviews the material in the same manner as the trial court and in the light most favorable to the nonmoving party. *Morris v. McNichol*, 83 Wn.2d 491, 494-95, 519 P.2d 7 (1974).

A moving party is entitled to summary judgment if there are no material issues of fact and judgment should be entered as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends in whole or in part. *Morris*, 83 Wn.2d at 494. The burden of showing that there is no material issue of fact is on the moving party. *Hash v. Children's Orthopedic Hosp. & Med. Ctr.*, 110 Wn.2d 912, 915, 757 P.2d 507 (1988). "Only after the moving party has met its burden of producing factual evidence showing that it is entitled to judgment as a matter of law does the burden shift to the nonmoving party to set forth facts showing that there is a genuine issue of material fact." *Id.* Summary judgment should be granted only if reasonable persons can reach but one conclusion. *Id.*

1. *Whether HEB's viewing rooms are a lawful nonconforming use*

CA-WA contends that HEB's viewing rooms are a lawful nonconforming use and therefore are not subject to the licensing and zoning requirements of SVMC. CA-WA

13

maintains that the Spokane County Code in place when HEB began operating its viewing rooms did not apply to (and therefore did not prohibit) multi-occupancy viewing rooms.

Municipal ordinances are interpreted using the same rules as statutes. *Sleasman v. City of Lacey*, 159 Wn.2d 639, 643, 151 P.3d 990 (2007). Statutes are to be read in pari materia, meaning that statutes relating to the same subject matter must be construed together as constituting a unified whole. *Hallauer v. Spectrum Prop. Inc.*, 143 Wn.2d 126, 146, 18 P.3d 540 (2001). If a statute is ambiguous, the courts must construe the statute as to effectuate its legislative intent, while avoiding a literal reading if it would result in unlikely, absurd, or strained consequences. *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996). Zoning ordinances are in derogation of common law and must be strictly construed in favor of property owners and should not be extended by implication to cases not clearly within their scope and purpose. *Morin v. Johnson*, 49 Wn.2d 275, 279, 300 P.2d 569 (1956).

A nonconforming use is defined in the City's code. SVMC 19.20.060(A) provides in part that any use that does not conform to the present regulations of the zoning district shall be deemed a nonconforming use if it was in existence and in continuous use and lawful operation prior to the regulations. A nonconforming use is allowed to continue indefinitely provided that the use is not discontinued or abandoned. SVMC 19.20.060(B). *But see* SVMC 5.10.150 (requiring lawfully operating adult entertainment establishments to conform to 2010 licensing revisions within 90 days).

14

When HEB began operating its viewing rooms, it was governed by Spokane County's regulations on adult entertainment establishments. One type of adult entertainment establishment under the SCC was an adult arcade establishment. SCC 7.80.040. The SCC defined an "adult arcade establishment" as "a commercial premises to which a member of the public is . . . admitted and where *adult arcade stations, booths, or devices* are used to exhibit or display a graphic . . . videotape, or digital display of specified sexual activity . . . *in a booth setting* to a member of the public on a regular basis or as a substantial part of the premises activity." SCC 7.80.040 (emphasis added).

The SCC defined "adult arcade station" as "an enclosure where a patron . . . would ordinarily be positioned while using an *adult arcade device . . . in a booth.*" SCC 7.80.040 (emphasis added). The definition explicitly excepted from its coverage a private office used by an owner, manager, or employee not held out for use by the public. The SCC defined an "adult arcade device" as "any device which, for payment of a fee . . . is used to exhibit or display a graphic . . . videotape, or digital display of specified sexual activity . . . *in a booth setting.*" SCC 7.80.040.

CA-WA contends that HEB's viewing rooms are not "booths" because the rooms allow for multiple people. *Webster's Third New International Dictionary* defines "booth" as

15

> **2a:** a temporary structure . . . **b:** a totally or partially enclosed structure often inside a building; *esp:* a small enclosure designed to hold one person at a time usu. to afford privacy or to separate its occupant from patrons or customers . . . **3:** an enclosure of varying size and construction designed to isolate an area and to prevent the functions carried on within it from being interfered with by the surrounding area.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 254 (1993). *Webster's* therefore defines "booth" in a manner that may, but need not, refer to a single-occupancy space.

We therefore must interpret "booth" to effectuate the County's intent. We note that the County sought to regulate a booth, not a theater. We surmise the County's intent was to regulate lewd activities which are more likely to occur in a semi-private space than a semi-public space. The record before us establishes that lewd activities are just as likely to occur in rooms with two or three persons as rooms with only one person. For this reason, we determine that "booth" is not limited to a one-person space. Although CA-WA contends that HEB's viewing rooms allow up to 10 occupants, the record establishes that the rooms typically had only one, two, or three persons in them, thus encouraging lewd conduct because of the room's semi-privacy. We, therefore, determine that HEB's multi-person viewing rooms come within SCC's definition of adult entertainment establishments.

Because HEB did not have a license from Spokane County to operate such a business, it is not a lawful nonconforming use. *See First Pioneer Trading Co. v. Pierce County*, 146 Wn. App. 606, 617, 191 P.3d 928 (2008). In addition, HEB's operation of

16

an adult entertainment establishment in a B-3 zone was not lawful because it was located

within 1,000 feet of property zoned UR-22. Because HEB's viewing rooms were not a

lawful operation prior to the existence of the SVMC, HEB's viewing rooms are not a

lawful nonconforming use under SVMC 19.20.060(A).

2.      *Whether HEB's viewing rooms are subject to the licensing requirement of chapter 5.10 SVMC.*

CA-WA puts forth two arguments why chapter 5.10 SVMC should not apply to

HEB's viewing rooms. First, CA-WA contends that chapter 5.10 SVMC should be

construed to apply only to enclosures which accommodate a single patron. In support of

this argument, CA-WA cites SVMC 5.10.080(C)(6), which allows for only one person in

an adult arcade station. SVMC 5.10.080(C)(6) provides:

> 6. No adult arcade station may be occupied by more than one person
> at any time. Any chair or other seating surface within an adult arcade
> station shall not provide a seating surface of greater than 18 inches in either
> length or width. Only one such chair or other seating surface shall be
> placed in any adult arcade station.

The definitions for adult arcade establishment, adult arcade station, and adult

arcade device in chapter 5.10 SVMC are substantially similar to the definitions in

SCC 7.80.040. The primary difference is that the SVMC definitions omit references to

"booth" or "booth setting." As stated in the analysis of SCC 7.80.040, the definitions did

not limit the occupancy in each booth to a single person. The removal of "booth" or

17

"booth setting" further clarifies that the City intended to regulate lewd conduct beyond that which might occur in a single-occupant enclosure.

The interpretation of "adult entertainment establishment," which includes adult arcade establishments, does not change when read in conjunction with the requirement of SVMC 5.10.080(C)(6) that adult arcade stations be limited to one person. SVMC 5.10.080(C)(6) limits the number of occupants permitted in the enclosure, but does not change the definition of adult entertainment establishment. Instead, SVMC 5.10.080(C)(6) is merely a requirement that the adult arcade establishment must meet to obtain and retain its license.

CA-WA's second argument is that the definition of "adult arcade station" refers to "an area in which an adult arcade device is located," and HEB's viewing rooms do not contain the adult arcade device, i.e., the projector or DVD player. HEB's argument is not well taken. "Adult arcade device" includes a large television screen, one of which is in each viewing room, because the large television screen is a device used to display graphic videotapes or films.

Moreover, CA-WA's contention that HEB's small, enclosed, multi-occupant viewing rooms are outside the scope of the regulations leads to an absurd outcome. Under this interpretation, an operator of adult arcade devices can simply add a second chair to the small partitioned enclosure and evade regulation. This outcome misses the City's intent to regulate the lewd conduct that occurs in a small semi-private room where

18

sexually explicit videos are shown. Thus, chapter 5.10 SVMC encompasses HEB's multi-occupant viewing rooms.

3. *Whether HEB has standing to challenge chapter 5.10 SVMC*

CA-WA contends that the trial court erred in determining that HEB lacked standing to challenge chapter 5.10 SVMC. The trial court determined that because HEB's operations are not located on a parcel which it could lawfully operate in accordance with City zoning requirements, that HEB lacked standing to challenge the constitutionality of chapter 5.10 SVMC. CA-WA argues that special standing rules apply to constitutional challenges based on claims of vagueness, over breadth, and impermissible prior restraint, and it can raise these challenges even though it cannot claim it has been affected by the features which it claims are unconstitutional. In support of its argument, CA-WA cites *Ramm v. City of Seattle*, 66 Wn. App. 15, 830 P.2d 395 (1992), *O-Day v. King County*, 109 Wn.2d 796, 749 P.2d 142 (1988), *City of Tacoma v. Luvene*, 118 Wn.2d 826, 827 P.2d 1374 (1992), *State v. Halstien*, 122 Wn.2d 109, 857 P.2d 270 (1993), *JJR, Inc. v. City of Seattle*, 126 Wn.2d 1, 891 P.2d 720 (1995), and *Clark v. City of Lakewood*, 259 F.3d 996g (9th Cir. 2001). The City does not directly respond to CA-WA's argument. We therefore will assume for purposes of our analysis that HEB has standing to make facial challenges to the City's licensing ordinance.

19

4.    *Whether the City's licensing and zoning ordinances are constitutional*

CA-WA asserts various constitutional arguments. As it relates to the City's

licensing ordinance, CA-WA makes federal and state facial challenges pertaining to

vagueness, over breadth, and prior restraint. As it relates to the City's zoning ordinance,

CA-WA argues, under the *Renton*[3] test, that the zoning ordinance is not narrowly tailored

(or is over broad), and does not allow for a reasonable opportunity to operate an adult

business. In addition, CA-WA argues that the zoning ordinance amounts to a prior

restraint under the Washington Constitution.

The City responds by combining the licensing and zoning challenges together, by

providing an overview of federal and state constitutional free speech decisional law

applicable to sexually oriented businesses, and then addressing the specific issues raised

by CA-WA. Because the City does not argue that CA-WA lacks standing to challenge

the licensing ordinance, we address CA-WA's challenges to the City's licensing

ordinance.

a.    *The* Renton *test applied to the City's licensing and zoning ordinances*

Filmed materials showing sexually explicit conduct are pure speech for the

purposes of the First Amendment. *World Wide Video, Inc. v. City of Tukwila*, 117 Wn.2d

382, 388, 816 P.2d 18 (1991). Federal law provides the basis for protection of First

---

[3] *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986).

Amendment speech rights, with necessary consideration given to the greater protections of article I, section 5 of the Washington Constitution when appropriate. *Id.* at 387. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986) is the seminal case which sets forth the analytical framework for determining whether a court must apply strict or intermediate scrutiny to the ordinance.

> First, the ordinance cannot be a complete ban on the protected expression. Second, the ordinance must be content-neutral or, if content-based with respect to sexual and pornographic speech, its predominate concern must be the secondary effects of such speech in the community. [And if the first two steps are met], [t]hird, the regulation must pass intermediate scrutiny. It must serve a substantial government interest, be narrowly tailored to serve that interest, and allow for reasonable alternative avenues of communication.

*Fantasyland Video, Inc. v. County of San Diego*, 505 F.3d 996, 1001 (9th Cir. 2007) (citations omitted).

      1.    *Not a complete ban*: The first step is whether the City's adult entertainment regulations are "a complete ban on the protected expression." *Id.* Here, neither the zoning regulations nor the licensing regulations are a complete ban. Adult entertainment establishments are allowed in the City, albeit with restrictions. CA-WA does not argue that the restrictions ban adult entertainment establishments altogether. The City's zoning and licensing regulations on adult entertainment pass the first prong under *Renton*.

2.    *Content neutral*: The second step requires that "the ordinance must be content-neutral or, if content-based with respect to sexual and pornographic speech, its predominate concern must be the secondary effects of such speech in the community." *Id.* Regulations aimed at controlling the secondary effects of adult entertainment establishments are content neutral. *World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186, 1191 (9th Cir. 2004). Courts look to the primary motivation behind the regulation to determine whether the purpose is to remedy the secondary effects associated with sexually oriented businesses. *See id.* Regulations that are designed to combat the undesirable secondary effects of adult entertainment businesses are analyzed as time, place, and manner regulations. *Renton*, 475 U.S. at 46.

Here, the record shows that the City's concern for the secondary effects of the adult entertainment establishments was the primary motivation for enacting both the licensing and the zoning regulations. The record establishes that for the 2010 licensing regulations and the 2007 zoning regulations, the City engaged in a careful review of a variety of materials when considering the secondary effects of adult businesses. The record also contains letters from citizens and police reports that document the unwanted secondary effects from adult businesses specifically in the City of Spokane Valley. These secondary effects include loitering in the area around the businesses, discarding used and contaminated "toys," using private areas of neighboring businesses to have sex,

an increase in crime, multiple incidents of masturbation within the establishment, and observations of prostitution.

The City regulations are explicitly intended to combat the secondary effects of adult entertainment establishment's speech, not to suppress the speech itself. CA-WA presents no evidence that would call this motivation into doubt. Because the regulations are intended to combat the secondary effects of adult entertainment establishments, the regulations are content neutral. Therefore, the City's licensing and zoning regulations of adult entertainment pass the *Renton* test.

3. *Intermediate scrutiny*: The final step requires the regulation to pass intermediate scrutiny. "An ordinance aimed at combating the secondary effects of a particular type of speech survives intermediate scrutiny 'if it is designed to serve a substantial government interest, is narrowly tailored to serve that interest, and does not unreasonably limit alternative avenues of communication.'" *World Wide Video*, 368 F.3d 1192 (quoting *Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1166 (9th Cir. 2003)).

A. *Substantial government interest.* A local government has a substantial interest in attempting to preserve the quality of urban life. *Renton*, 475 U.S. at 50. Specifically, a city has a substantial interest in curbing the secondary effects associated with adult entertainment establishments. *Maripoca County*, 336 F.3d at 1166. For instance, reducing unlawful public sexual activity is a proper concern associated with

the regulation of sexually oriented businesses. *Id.* Additionally, courts have found a substantial interest unrelated to expression in the presence of "[r]ampant masturbation at a commercial property open to the public" because this "may rationally trigger sanitation concerns and impair the right of other patrons to view their materials or read the accompanying articles in peace." *Fantasyland Video*, 505 F.3d at 1003. The "'elimination of pornographic litter, by itself, represents a substantial governmental interest, especially as concerns the protection of minors.'" *World Wide Video*, 368 F.3d at 1195 (quoting *World Wide Video of Wash., Inc. v. City of Spokane*, 227 F. Supp. 2d 1143,1157-58 (E.D. Wash. 2002), *aff'd*, 368 F.3d 1186.

A city is not required to conduct its own study in order to justify a regulation designed to combat the secondary effects of an adult business. *World Wide Video*, 368 F.3d at 1193. A city can rely on evidence produced by other cities if the evidence is relevant to the problem that the city intends to address. *Id.* at 1192. However,

> "The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance."

*Id.* at 1193 (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438-39, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (2002)) (plurality opinion).

24

Here, the City had a substantial interest in controlling the secondary effects of the adult entertainment establishments, including public sexual activity. The City produced evidence that justified the need for such regulation. As previously discussed, the record contains indications of pornographic litter, sexual conduct in public places, and increased criminal behavior. Neighboring business owners have observed sexual conduct in vehicles parked adjacent to HEB and used condoms have been found in the parking lots around HEB. CA-WA has not presented evidence to cast doubt on the City's rationale for the regulations.

Additionally, the methods chosen by the City are designed to serve the government interest. Requiring adult businesses to be located in a zone away from places where children gather, such as parks, schools, and churches, serves the purpose of protecting the City from public sexual activity and works to preserve the quality of urban life. The secondary effects that occur both inside and outside of HEB are a substantial government interest for the City to regulate.

B. *Narrowly tailored.* The second prong of intermediate scrutiny asks whether the regulation is "narrowly tailored" to serve the purported government interest. *Fantasyland Video*, 505 F.3d at 1001. This test requires demonstrating that the "'regulation promotes a substantial government interest that would be achieved less effectively absent the regulation' and 'the means chosen are not substantially broader than necessary.'" *Id.* at 1004 (internal quotation marks omitted)

25

(quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)).

"A zoning measure can be consistent with the First Amendment if it is likely to cause a significant decrease in secondary effects and a trivial decrease in the quantity of speech." *Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring). "The incidental restriction on expression which results from the City's attempt to accomplish such a purpose is considered justified as a reasonable regulation of the time, place, or manner of expression if it is narrowly tailored to serve that interest." *Members of City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984)).

The necessity for legislation need not be proved absolutely. *Adult Entm't Ctr., Inc. v. Pierce County*, 57 Wn. App. 435, 439, 788 P.2d 1102 (1990). Governments are given broad latitude in experimenting with possible solutions to problems of vital concern. *Id.* Ordinances are not invalid "'simply because there is some imaginable alternative that might be less burdensome on speech.'" *Ward*, 491 U.S. at 797 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S. Ct. 2897, 86 L. Ed. 2d 536 (1985)).

The City's zoning regulations for adult entertainment uses are narrowly tailored to serve the government interest. The regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. Without zoning restrictions on where an adult entertainment establishment can be located, the government interest in

26

reducing the secondary effects of these adult businesses would not be met. By limiting these businesses to areas away from areas where the public congregates, the City can limit the secondary effects of unsanitary situations and pornographic litter, especially as it concerns the protection of minors. The zoning regulations preserve the quality of urban life.

In addition, the City's licensing regulations are narrowly tailored to serve the government interest. The regulations prohibit more than one person in any arcade station or enclosure, and generally set forth limitations where a store manager can assure that patrons do not engage in lewd acts while viewing sexually explicit videos.

CA-WA does not contend that the zoning or licensing regulations will not have this desired effect. Instead, CA-WA argues that the zoning regulations are not narrowly tailored because the regulations encompass other businesses that do not produce adverse secondary effects targeted by the City. For instance, CA-WA contends that the definition for adult arcade establishment applies to ordinary movie theaters where sexually explicit activities or conduct are not the predominant theme of the movie, and to hotels and motels that provide sexually oriented movies to guests on closed circuit televisions. Thus, CA-WA maintains that the means chosen are substantially broader than necessary.

CA-WA's argument mixes questions of over breadth with narrowly tailored. The difference between over breadth and narrowly tailored is whether the regulation is challenged as it applies or on its face. *See Taxpayers for Vincent*, 466 U.S. at 808-10.

27

"Narrowly tailored" is part of a constitutional challenge that looks at the regulation as applied to the person subject to the ordinance. *See id.* at 803-09. The question is whether the restriction on *the person's* expressive activity is substantially broader than necessary to protect the City's interest in eliminating the secondary effect. *Id.* at 808.

Over breadth is a facial challenge that looks at whether a regulation is written so broadly that it may inhibit the constitutionally protected speech of third parties. *Id.* at 800-01. The doctrine considers that some regulations may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected. *Id.* "'Thus, a person whose activity could validly be suppressed under a more narrowly drawn law is allowed to challenge an overbroad law because of its application to others.'" *Id.* at 800 n.19 (quoting John Calvin Jeffries, Jr., *Rethinking Prior Restraint*, 92 YALE L.J. 409, 425 (1983)). Thus, over breadth usually involves standing issues, as "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on over breadth grounds." *Id.* at 801.

Here, CA-WA does not argue that any portion of the licensing or zoning regulation is not narrowly tailored to its own activities. Rather, CA-WA presents a facial challenge, arguing that parties not before this court—ordinary movie theaters, hotels, and motels—are regulated by the ordinance, and that the ordinance is overly broad because

28

there is no evidence that such entities contribute to the secondary effects which the ordinances seek to reduce.

Even if a facially over broad challenge was pertinent to the *Renton* test, and we do not believe it is, the challenge would fail. We do not construe ordinary movie theaters, hotels, and motels as being within the definition of "adult entertainment establishment." As mentioned previously, "adult entertainment establishment" includes an "adult arcade establishment." For a business to be an "adult arcade establishment," it must operate an adult arcade station or adult arcade device which is used to display *"specified sexual activities"* or *"sexual conduct"* on a *"regular basis"* or as a *"substantial part of the premises activity."* SVMC Appendix A; SVMC 5.10.010 (emphasis added). "Specified sexual activities" is defined as (1) human genitals in a state of sexual stimulation or arousal; (2) acts of human masturbation, sexual intercourse, sodomy, oral copulation, or bestiality; or (3) foundling or other erotic touching of human genitals, pubic region, buttocks or female breasts. SVMC 5.10.010. "Sexual conduct" is defined as (1) sexual intercourse within its ordinary meaning, occurring upon any penetrations, however slight; or (2) a penetration of the vagina or anus, however slight, by an object; or (3) a contact between persons involving the sex organs of one person and the mouth or anus of another; or (4) masturbation, manual or instrumental, of oneself or of one person by another; or (5) touching of the sex organs, anus, or female breasts, whether clothed or unclothed, of oneself or of one person by another. SVMC 5.10.010.

29

The above interplay of definitions convinces us that an ordinary movie theater is not an adult entertainment establishment. The record is devoid of any evidence suggesting that ordinary movie theaters regularly feature films with that type of sexual activity or sexual conduct described within the definition. Nor does this description apply to hotels or motels. The record is similarly devoid of any evidence that televisions within hotel or motel rooms which permit closed-circuit viewing of pornography are actually used for such purposes on a *regular basis*.[4] Mere allegations are insufficient to create a genuine issue of material fact.

      C.    *Alternative avenues of communication.* The final prong of intermediate scrutiny inquires whether alternative avenues of communication remain available under the challenged regulation. *Fantasyland Video*, 505 F.3d at 1001. This prong analyzes whether local zoning restrictions that affect sexually oriented businesses nevertheless allow such businesses "a reasonable opportunity to open and operate." *Renton*, 475 U.S. at 54.

A city has the initial burden of producing a list of potential relocation sites that reflects the relevant zoning restrictions. *Tollis, Inc. v. County of San Diego*, 505 F.3d 935, 941 (9th Cir. 2007). The burden then shifts to the affected party to demonstrate that the city's list included unavailable sites or was compiled in the absence of reasonableness

---

    [4] "Regular" in this context, means "recurring . . . at fixed, uniform, or normal intervals." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1048 (11th ed. 2003).

and good faith. *Id.* After a list of potential sites is determined, the issue becomes assessing whether the market contains a sufficient number of potential relocation sites for the adult business. *Id.* at 942. The initial calculation of available relocation sites is a factual issue and the sufficiency of the sites for allowing adult expression is a question of law. *David Vincent, Inc. v. Broward County*, 200 F.3d 1325, 1333-35 (11th Cir. 2000).

For a site to be a considered a sufficient location, "it 'must be considered part of an actual business real estate market for commercial enterprises generally.'" *Tollis*, 505 F.3d at 941 (quoting *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000)). "If in an industrial or manufacturing zone, the site must be 'reasonably accessible to the general public,' 'have a proper infra-structure,' and be suitable for 'some generic commercial enterprise.'" *Id.* (quoting *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1531 (9th Cir. 1993)). "Finally, the list must account for other relevant zoning restrictions, such as separation requirements, that might affect a site's availability." *Id.* "[T]he economic feasibility of relocating to a site is not a First Amendment concern." *David Vincent*, 200 F.3d at 1334.

A city is not required to make a certain number of sites available for relocation. *Diamond v. City of Taft*, 215 F.3d 1052, 1056 (9th Cir. 2000). To determine if there are a sufficient number of available sites, courts usually look at either the percentage of land within the city available to businesses, or the number of sites compared with the number of adult businesses currently in existence or seeking to open. *Id.* at 1056-57.

31

CA-WA contends that summary judgment was not appropriate on the alternative avenues of communication prong because a genuine issue of material fact exists as to whether the City presented a reasonable number of potential relocation sites for HEB. CA-WA maintains that nearly one-half of the sites identified by the City were not likely to become available for generic business use in the near future because the property was in a rail yard or taken by a well-established business. Five of the properties were occupied by the railroad and one by the Spokane Transit Authority. Additionally, CA-WA contends that nearly all of the sites the City listed as available were occupied.

The trial court did not err in granting summary judgment. The City presented 54 sites that it found to be available for relocation after making the appropriate deductions for industrial/manufacturing zones and lack of access. In comparison, CA-WA's number of available sites was not much different. CA-WA's experts found 39 properties that met zoning and set back requirements. Thus, for purposes of summary judgment, the parties agreed that at least 39 potential relocation sites existed.

CA-WA's argument that the majority of the parcels were occupied does not necessarily make the parcels unavailable. Parcels only have to be potentially available, not actually available. *McKibben v. Snohomish County*, 72 F. Supp. 3d 1190, 1205, (W.D. Wash. 2014). "[T]he mere fact that a site is currently occupied or not currently for sale or lease does not render it unavailable." *Id.* However, evidence of a long term lease may exclude a potential site from the available market if the plaintiff provides evidence

32

regarding the length of the lease. *Id.* To designate an occupied business as unavailable, the affected party must offer "sufficient evidence to show that these sites would not reasonably become available to any commercial enterprise." *Diamond*, 215 F.3d at 1056.

CA-WA's declaration from Mr. Crisler was not sufficient to establish that the property would be unavailable to any commercial enterprise. Mr. Crisler determined site availability by obtaining the property profiles from a METROSCAN, talking to the property owner, and visiting the property. Based on the information he gathered, Mr. Crisler rendered his opinion as to which of the sites was subject to a long-term lease and which was unlikely to become available for lease or sale in the reasonable foreseeable future. However, Mr. Crisler's opinion is insufficient to establish that these properties are not part of the relevant commercial market. He did not present the length of leases or indicate how far into the future the owner's intentions not to sell extended. Current occupancy alone is not grounds for unavailability. The 39 sites identified by CA-WA and the City are part of the relevant market for commercial enterprises. The 39 available sites allowed CA-WA a sufficient opportunity to relocate. We conclude that the City's licensing and zoning ordinances satisfy First Amendment concerns under the *Renton* analysis.

b.      *Whether the City's ordinances are a prior restraint*

1.      *Examination of licensing ordinances SVMC 5.10.080(C)(6) and SVMC 5.10.080(D)(3)*

CA-WA contends that two of the City's licensing ordinances constitute a prior restraint because one or both effectively puts adult theaters and its viewing rooms out of business. SVMC 5.10.080(C)(6) requires adult arcade stations to be limited to one occupant, and SVMC 5.10.080(D)(3) requires all adult arcade stations to be "open to the public room so that the area inside is fully and completely visible to the manager." The City responds that adult theaters are not within the scope of chapter 5.10 SVMC because "enclosure," within the definition of "adult arcade station," should be construed broader than single occupancy, but narrower than a semi-public area.

We reject the City's argument. A business is regulated under chapter 5.10 SVMC if it is an adult entertainment establishment, and a business qualifies as an "adult entertainment establishment" if it operates an "adult arcade establishment." An adult arcade establishment, in turn, is defined to include businesses which use either an adult arcade station *or an adult arcade device*. Because the definition of "adult arcade device" does not have an enclosure limitation, and because an adult theater uses a large movie screen to display films of sexual activities or sexual conduct on a regular basis or as a substantial part of its activity, an adult theater uses an adult arcade device, and therefore is an adult arcade establishment and within the scope of chapter 5.10 SVMC.

We agree with CA-WA that SVMC 5.10.080(C)(6)'s limitation of one person per theater prevents adult theaters from operating in Spokane Valley.[5] But we disagree that SVMC 5.10.080(D)(3) prevents viewing rooms from operating in Spokane Valley. Rather, viewing rooms may operate provided that various reasonable safeguards are in place to prevent lewd conduct from occurring within the viewing area.

The fact that semi-private viewing of erotic materials must occur in individual viewing areas rather than in a theater setting does not render the licensing ordinance unconstitutional. The determinative question is not whether the regulation prohibits an adult theater. Rather, the determinative question is whether forbidding adult theaters unconstitutionally interferes with the communication of the erotic message. Stated another way, one does not have a constitutional right to view graphic films; rather, the actors and the businesses which make and produce graphic films have a constitutional right to communicate their erotic messages.

There is no evidence in the record that prohibiting adult theaters would interfere with actors and businesses making and producing graphic films. Modern technology has replaced adult theaters first with VHS, and now with DVD's, allowing actors and the businesses which make and produce graphic films to market their protected messages in

---

[5] The City asserts that it never intended that chapter 5.10 SVMC apply to adult theaters. Nevertheless, until the definition of adult arcade establishment is narrowed, the specter of this application exists and warrants further discussion by this court.

ways not possible 25 years ago. During oral argument, counsel for CA-WA was questioned why adult theaters and viewing rooms continue to exist, given the widespread availability of graphic videos which can be viewed free over one's computer or smartphone. Counsel responded that perhaps some people do not want to view graphic content in the vicinity of family members. Under our construction of the City's licensing ordinance, people still can view graphic content in a semi-private setting, away from family members, but they may do so only under conditions which minimize lewd conduct.

2. *Examination of the zoning ordinance under Washington constitutional standards applicable to prior restraints*

CA-WA contends that the time, place, and manner restrictions in chapter 19.80 SVMC amount to prior restraint through zoning. CA-WA argues that SVMC's zoning regulations effectively ban all adult entertainment establishments in instances where the approved zones have no properties readily available for lease or purchase. According to CA-WA, this total ban is so restrictive that it is a prior restraint under the enhanced protection of the Washington Constitution.

The text and history of article I, section 5 of the Washington Constitution dictate enhanced protection under the Washington Constitution in the context of adult entertainment regulations that impose prior restraints. *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 116-17, 937 P.2d 154 (1997). The strict standard under the Washington

Constitution is that prior restraint of constitutionally protected expression is per se unconstitutional. *O'Day*, 109 Wn.2d at 803-04.

Prior restraints are defined as "'official restrictions imposed upon speech or other forms of expression in advance of actual publication.'" *City of Seattle v. Bittner*, 81 Wn.2d 747, 756, 505 P.2d 126 (1973) (quoting Thomas I. Emerson, 20 *Law and Contemporary Problems* 648 (1955)). Before applying the highly protective rules against prior restraint, courts must first determine whether the challenged rule affects expression. "Regulations that sweep too broadly chill protected speech prior to publication and this may rise to the level of a prior restraint." *O'Day*, 109 Wn.2d at 804.

However, time, place, and manner restrictions on adult entertainment are not prior restraints and do not merit the more rigorous analysis afforded under the Washington Constitution for pure speech in a traditional public forum. *Ino Ino*, 132 Wn.2d at 121. The exact causal relationship between a regulation and a targeted adverse secondary effect does not need to be proved under a prior restraint analysis. *Id.* at 127. It is enough that a regulation is related to an overall problem a city seeks to correct. *Id.*

The requirement that CA-WA relocate HEB is not a prior restraint. The zoning regulations here are content neutral and valid time, place, and manner restrictions. The City has a legitimate concern about the secondary effects of adult entertainment businesses. The regulations are narrowly tailored while still allowing speech in the approved zones. Also, we decline to find that the zoning regulation operates as a prior

37

restraint simply because CA-WA's expert opined that there were no available sites for immediate relocation. First, immediate availability is not required under the federal constitution or the state constitution. More importantly, CA-WA has not established that the property is not reasonably available. Instead, 39 properties have been identified as potential relocation sites. The zoning regulations in chapter 19.80 SVMC do act as a prior restraint on CA-WA's speech.

    c.    *Whether the licensing ordinance is over broad under the Washington Constitution*

CA-WA cites *Renton*, 475 U.S. at 46-47, to advance its argument that a regulation is overbroad if it targets businesses which have not been shown to produce adverse secondary effects. Specifically, CA-WA argues that the licensing ordinance impermissibly targets theaters that show sexually oriented movies on a part-time basis, theaters showing movies wherein the sexual conduct or specified sexual activities are not the predominant theme of the movie, and hotels and motels that provide sexually oriented movies to guests on closed circuit television.

"An overly broad statute that sweeps within its proscriptions protected expression is unconstitutional under both the Washington and United States Constitutions." *O'Day*, 109 Wn.2d at 803. "[W]here a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *World*

*Wide Video*, 368 F.3d at 1198 (quoting *Osborne v. Ohio*, 495 U.S. 103, 112, 110 S. Ct.
1691, 109 L. Ed. 2d 98 (1990)).

We previously rejected CA-WA's over breadth challenge under the First
Amendment, concluding that the licensing ordinance did not apply to ordinary theaters or
hotels and motels showing adult movies over closed circuit televisions. Although the
licensing ordinance applies to adult theaters, CA-WA concedes that the City's legislative
record includes secondary effects attributable to adult theaters. Therefore, because the
licensing ordinance does not seek to regulate activities that have not been shown to have
adverse secondary effects, the licensing ordinance is not overbroad.

d.     *Whether the definition of adult arcade establishment in chapter 5.10 SVMC
       is unconstitutionally vague*

CA-WA contends that the definition for adult arcade establishment is void for
vagueness in violation of the due process clause. CA-WA maintains that definition is
unclear as to what constitutes showing movies on a "regular basis" or as a "substantial"
part of the premises activity, and that the section fails to specify what percentage of
sexual content in a particular movie would trigger applicability of the code.

For a regulation to be void for vagueness under the due process clause of the
Fourteenth Amendment, the regulation must be so unclear that a person of common
intelligence must necessarily guess as to its meaning and differ as to its application. *City
of Spokane v. Douglass*, 115 Wn.2d 171, 179, 795 P.2d 693 (1990) (quoting *Burien Bark*

39

*Supply v. King County*, 106 Wn.2d 868, 871, 725 P.2d 994 (1986)). The test does not demand impossible standards of specificity, and if persons of ordinary intelligence can understand what the ordinance proscribes, notwithstanding possible areas of disagreement, the ordinance is sufficiently definite. *Id.*

The language used in the enactment is afforded a sensible, meaningful, and practical interpretation. *Id.* at 180; *see State v. Dixon*, 78 Wn.2d 796, 805, 479 P.2d 931 (1971). "Vagueness doctrine cannot be understood in a manner that prohibits governments from addressing problems that are difficult to define in objective terms." *Gammoh v. City of La Habra*, 395 F.3d 1114, 1121 (9th Cir. 2005). In determining whether a challenged ordinance is sufficiently definite, the language of the ordinance is not examined in a vacuum. Rather, the context of the entire enactment is considered. *City of Seattle v. Huff*, 111 Wn.2d 923, 929, 767 P.2d 572 (1989). "[O]therwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity." *Gammoh*, 395 F.3d at 1120.

In *Gammoh*, the court held that subjective terms in a definition for cabaret dancer did not void the entire regulation in which the definition applied. *Id.* The court examined whether the subjective terms when used in combination with other terms gives notice of what is being regulated and whether the prohibited conduct is defined objectively. *Id.* Using these methods, the court determined that the definition of "adult cabaret dancer" was not vague even though it contained subjective terms such as "sexually oriented

40

dancer," "exotic dancer," "regular basis," and "focuses or emphasizes." *Id.* The Court found that a combination of features defined an adult cabaret dancer and the definition as a whole gave performers ample guidance on who is and who is not subject to the regulation. *Id.* The court also found despite the subjective terms, the targeted conduct prohibiting cabaret dancers from performing two feet from a patron was objectively defined. *Id.*

The challenged definitions are not unconstitutionally vague. An adult arcade establishment is defined by a combination of objective, defined, and subjective terms. Below, we italicize the terms which are further defined in the City's definition of "adult arcade station" to show the particularity that the City used to assist businesses in knowing whether their activities were regulated. According to the definition, an "adult arcade establishment" is (1) a commercial premises (2) where a member of the public is admitted (3) where *adult arcade station* or *adult arcade devices* are used to (4) exhibit or display a graphic picture, view, film, videotape, or digital display of (5) a *specified sexual activity* or *sexual conduct* to a member of the public, (5) on a regular basis or as a substantial part of the premises activity. SVMC 5.10.010. When considered together, the objective, defined, and subjective terms give sufficient notice of what constitutes an adult arcade establishment. A person of ordinary intelligence can tell that a business that is open to the public and regularly shows digital displays of explicit sexual activity is subject to the licensing regulations. Precise specificity is not required.

The inclusion of the subjective terms, "regular basis" and "substantial," does not make the entire adult arcade establishment definition void for vagueness. Prior cases have upheld the use of the terms "significant or substantial" in this context. *World Wide Video*, 368 F.3d at 1198. Further, although Appendix A of the SVMC does not define "regular" or "substantial," the appendix directs courts to interpret undefined words using *Webster's New Collegiate Dictionary. Merriam-Webster's Collegiate Dictionary* defines "regular" to mean "recurring . . . at fixed, uniform, or normal intervals," and defines "substantial" to mean "being largely but not wholly that which is specified." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1048, 1245 (11th ed. 2003). The combination of subjective with objective and defined terms gives a sufficiently clear picture of an adult arcade establishment and the business activity that is the subject of the licensing requirement.

## CONCLUSION

In summary, we conclude that HEB's viewing rooms are not a lawful nonconforming use, that the City's licensing and zoning regulations apply to HEB, and that those regulations are not unconstitutional.

Affirm.

No. 33140-7-III
*City of Spokane v. Hollywood Erotic Boutique*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____     _____
Siddoway, C.J.                       Fearing, J.

43